IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

|  |  |
|---|---|
| EUGENE MICKEY III, #3038555, #417152 | * |
| Plaintiff, | * |
| | * |
| v. | Case No.: GJH-15-3876 |
| | * |
| WEXFORD (STAFF at MCIH), *et al.*,[1] | * |
| Defendants. | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Eugene Mickey III ("Plaintiff") is an inmate incarcerated at the Maryland Correctional

Institution in Hagerstown, Maryland ("MCIH"). Pending before the Court is his pro se

Complaint filed pursuant to 42 U.S.C. §1983, alleging that Defendants provided him with

inadequate post-surgical wound care. ECF No. 1 ("Complaint"). Defendants Wexford Health

Sources, Inc., Lori Slavick, P.A., and Richard Sampong, P.A., by their counsel, have filed a

Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 9, and

Plaintiff filed a Response in opposition, ECF No. 13. Defendants filed a Reply to Plaintiff's

Response. ECF No. 15.

After considering the pleadings and exhibits, the Court concludes a hearing is

unnecessary. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons that follow, Defendants' Motion

to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 9 shall be granted.

---

[1] Defendant is assumed to be Wexford Health Sources, Inc., a private corporation which provides medical care to inmates under contract with the State of Maryland. The Clerk shall amend the docket accordingly. A second Defendant's surname is Slavick. The Clerk shall amend the docket accordingly.

The claims against Wexford will be dismissed and summary judgment is granted as to claims against Defendants Slavick and Sampong.

## I.    BACKGROUND

On December 16, 2015, Plaintiff filed a Complaint alleging that Defendants' provided inadequate wound care after his surgery to repair a torn Achilles tendon. ECF No. 1. Plaintiff seeks an unspecified amount of monetary damages for his pain and suffering. ECF No. 1 at 3.[2]

Plaintiff states that he ruptured his Achilles tendon in February of 2015. *Id.* On June 11, 2015, he had surgery to repair the rupture at Bon Secours Hospital. *Id.* Plaintiff claims that he tested positive for E Coli and pseudomonas as a result of improper medical treatment. *Id.* Plaintiff asserts that the surgeon sent a progress note on August 21, 2015, to inform Defendants "what to do," but it was disregarded. *Id.* Plaintiff does not provide a copy of that progress note or specify what the surgeon recommended. He further alleges Defendants did not prescribe recommended medications, but fails to indicate what medicines were recommended, and that his treatment amounted to malpractice. *Id.*

Defendants filed 149 pages of Plaintiff's medical records and the declaration of Dolph Druckman, M.D., Acting Regional Medical Director at MCIH, in support of their dispositive motion. ECF No. 9-4; ECF No. 9-5. Defendants' verified exhibits detail the post-surgical wound treatment provided to Plaintiff, and the records are summarized below.

After his June 11, 2015 surgery at Bon Secours Hospital, Plaintiff was admitted to the infirmary at Jessup Correctional Institution. ECF No. 9-5 ¶ 6; ECF No. 9-4 at 9. Plaintiff was transferred to the MCIH infirmary on June 13, 2015, and was seen by Belay Tessema, M.D. ECF No. 9-5 ¶ 6; ECF No. 9-4 at 12-15. The medical report indicates Plaintiff had no fever, no

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

swelling at the wound site, no discharge, no bleeding, and no erythema. ECF No. 9-5 ¶ 6; ECF No. 9-4 at 12. Dr. Tessema indicated the injury and surgical site were healing and stable, and prescribed Robaxin, Acetomenophin-codeine, Percocet, Keflex, and Ibuprofen for Plaintiff. ECF No. 9-5 ¶ 6; ECF No. 9-4 at 13. Dr. Tessema also ordered daily wound cleaning with normal saline solution and dry dressing changes. ECF No. 9-4 at 13. Keflex, an antibiotic, was prescribed prophylactically as Plaintiff had no symptoms of infection at the wound site. ECF No. 9-5 ¶ 6. On June 13, 2015, Tamara Medina, R.N. changed Plaintiff's dressings, and noted no symptoms of infection. ECF No. 9-4 at 15.

Plaintiff remained in the infirmary until June 16, 2015. ECF No. 9-5 ¶ 7. Medical providers monitored his vital signs and changed his dressings. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 16-20. On June 16, 2015, Liberatus DeRosa, M.D. examined Plaintiff's wound, observed that it was continuing to improve, and noted no symptoms of infection. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 21-24. Dr. DeRosa continued Plaintiff's Percocet prescription until June 22, 2015, to address Plaintiff's complaints of continuing pain. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 24. Dr. DeRosa discharged Plaintiff from the infirmary with instructions to return in three days for a follow-up visit. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 24. Dr. DeRosa also ordered daily cleaning of the wound, instructed Plaintiff to perform toe pointing exercises, continued his medications, and directed him to minimize walking. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 24. Plaintiff was given crutches, placed on "feed in status" so that his meals were delivered to his cell, and instructed to wear a splint on his right ankle. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 24. The Keflex prescription was allowed to expire on June 17, 2015, in view of Plaintiff's improved healing and in the absence of any symptoms of infection. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 24. On June 17, 2015, Plaintiff was returned to the general prison population. ECF No. 9-5 ¶ 7; ECF No. 9-4 at 26.

On June 24, 2015, when Plaintiff was seen by Matthew Fairall, R.N., he rated his pain as 10 out of a possible 10. ECF No. 9-4 at 31. He complained that his medication had been stopped and he was having a hard time getting the dressing changed. *Id.* Plaintiff's Percocet and Baclofen prescriptions had expired on the previous day, June 23, 2015. *Id.* Fairall referred Plaintiff to a medical provider for a medication evaluation, ordered Tylenol for pain, and informed him that daily wound care had been scheduled. *Id.* Plaintiff was listed as a "no show" for his nursing sick call visit on July 7, 2015. *Id.* at 33.

On July 8, 2015, Jonathan Thompson, M.D. saw Plaintiff for an urgent provider visit. Mickey reported that his right foot hyperextended while he was trying to climb stairs to the dispensary, and he fell and hurt his lower back. ECF No. 9-5 ¶ 8; ECF No. 9-4 at 34. He reported that he slipped on water. ECF No. 9-4 at 36. Jessica Smith, R.N reported Plaintiff's dressing and ace bandages were soaking wet, and the dressing was changed. ECF No. 9-5 ¶ 8; ECF No. 9-4 at 36. Smith observed +2 pitting edema at the right foot, but observed no infection. ECF No. 9-5 ¶ 8; ECF No. 9-4 at 36. Dr. Thompson ordered x-rays of Plaintiff's lower spine, right ankle, and right knee. ECF No. 9-5 ¶ 8; ECF No. 9-4 at 34, 36. Plaintiff was placed on bed rest and feed-in, with his medications to be delivered to his cell, and was prescribed 325 mg. of Tylenol and Tramadol HcL for pain. ECF No. 9-4 at 34. The daily dressings were continued and Plaintiff was instructed to continue using crutches. *Id.* at 34, 36. Dr. Thompson ordered a follow-up visit in three weeks with Dr. Krishnaswammy, an orthopedic surgeon. *Id.* at 34. Plaintiff returned to his cell using his crutches. ECF No. 9-5 ¶ 8; ECF No. 9-4 at 34-37.

On July 10, 2015, Defendant Lori Slavick saw Plaintiff during provider rounds. Plaintiff reported feeling better. ECF No. 9-4 at 38-39. The results of his x-rays were still pending. *Id.* Plaintiff asked to go to the commissary, but was informed that because he was on feed-in status

he could not go. *Id.* He was informed that his safety was at risk as demonstrated by his fall two days prior. *Id.* Later that day, Matthew Fairall, R.N. examined Plaintiff at the prison dispensary for scheduled wound care. Plaintiff complained of aches, chills, a headache, and dizziness. *Id.* at 40-41. Plaintiff's temperature was 100.8 and his pulse was 110. *Id.* Fairall contacted Dr. Nimely for further orders. *Id.* Plaintiff was administered 400 mg of Motrin and medical tests were ordered. *Id.* Plaintiff was administered the first dose of Motrin at the dispensary and, after one hour, his fever reduced to 99.2 and his pulse reduced to 98.9. *Id.* Plaintiff was told to follow up in the morning, and returned to his housing unit in stable condition. *Id.*

On July 11, 2015, Dr. Tessema examined Plaintiff, who complained of pain in his right leg, swelling, and fever. ECF No. 9-5 ¶ 9; ECF No. 9-4 at 42-43. Dr. Tessema observed that Plaintiff's wound had opened, and it was tender and swollen. ECF No. 9-5 ¶ 9; ECF No. 9-4 at 42-43. Dr. Tessema diagnosed cellulitis, an infection, at the wound site. ECF No. 9-5 ¶ 9; ECF No. 9-4 at 42-43. He prescribed Baclofen, Clindamycin Hcl, Rocephin, and Potassium Chloride, and ordered Plaintiff be admitted to the infirmary with bed rest and daily dressing changes using sterile saline solution and a clean dry dressing ("wet dry dressing"). ECF No. 9-5 ¶ 9; ECF No. 9-4 at 42-43. He also ordered a comprehensive blood laboratory test panel. ECF No. 9-5 ¶ 9; ECF No. 9-4 at 42-43. While in the infirmary, Plaintiff reported feeling dizzy, slight chills and leg pain. ECF No. 9-4 at 44-51. His temperature measured 100.9, and he was administered antibiotics intravenously. *Id.* at 44.

On July 12, 2015, Defendant Sampong saw Plaintiff during infirmary rounds at 1:31 p.m. ECF No. 9-4 at 45-46. Sampong recorded Plaintiff's wound status as stable and continued Plaintiff's Tramadol and Rocephin prescriptions. *Id.* That evening at 5:48 p.m., Laura Ausherman, R.N. saw Plaintiff for skilled nursing care. *Id.* at 47. Plaintiff complained of pain

5

from his ankle to his calf, and Ausherman contacted Dr. Ottey, who gave a verbal order to administer Tylenol #3. *Id.* Ausherman observed Plaintiff's wound had a necrotic area approximately 1.5 inches long and 0.5 inches wide. *Id.* Several inches of the suture line were separated, approximately 2mm of the length of the wound, and were pink and draining. *Id.* Later, at 11:46 p.m., Plaintiff's dressing was changed again because it was dripping onto the bedding. *Id.* at 48.

On July 13, 2015, Cynthia Martin, R.N. saw Plaintiff for skilled nursing care. ECF No. 9-4 at 49. She reported that Plaintiff's appetite was good, that his dressing was clean, dry, and intact when it was changed, and that he was able to wiggle all his toes. *Id.* Martin noted minimum swelling, no pitting, and no redness. *Id.* Dr. DeRosa, who saw Plaintiff later that same day, reported that the infection was improving and Plaintiff had no fever, but noted Plaintiff was in severe pain with any movement of his right ankle and was unable to flex his foot. *Id.* at 50-51. DeRosa wrote that Plaintiff "had a short visit in infirmary and was discharged with f/u [follow-up] and during that time infection seemed to develop." *Id.* at 50. DeRosa said the tendon repair was abnormal. *Id.* There was wound dehiscence and Plaintiff had a deep space infection needing surgical debridement. *Id.* at 50-51. There was discoloration around the entire incision. *Id.* DeRosa prescribed Lovenoz and "wet dry" dressing changes twice daily. *Id.* at 51. DeRosa indicated no culture reports were noted on the medical chart to confirm the accuracy of the antibiotics administered, and he ordered lab studies. *Id.* at 50. DeRosa listed his assessment of Plaintiff's condition as "uncontrolled cellulitis/abscess leg." *Id.* at 51.

On July 14, 2015, Laura Asherman, R.N. noted Plaintiff's wound culture was completed. *Id.* at 52. She noted serosanguinous drainage from the wound. *Id.* Later that day, Dr. DeRosa reported Plaintiff's wound infection was not measurably improved, but was not worsening. *Id.* at

6

53. DeRosa discussed with Dr. Krishnaswammy that 20 cc of pus with slight pressure was expressed from the wound. *Id.* at 54. He noted Krishnaswammy wanted to see Plaintiff because he had worsened since his last follow up visit. *Id.* at 55; ECF No. 9-5 ¶ 9. Plaintiff's blood test results were returned and revealed infection with E. Coli and pseudomonas bacteria. ECF No. 9-4 at 58-61; ECF No. 9-5 ¶ 9.

On July 15, 2015, Dr. DeRosa noted Plaintiff was running a low grade temperature. ECF No. 9-4 at 57. Plaintiff's calf had slight induration suggesting spread of infection and resistance to the medications Rocephin and Clindamycin, but the wound had shown some improvement in the past 2 days. *Id.* DeRosa expressed concern that although Plaintiff was scheduled to be seen by Dr. Krishnaswammy on Friday, he might need to be seen sooner, and therefore asked the medical director to examine Plaintiff. *Id.* DeRosa changed Plaintiff's antibiotic to Vancomycin Hcl. *Id.* at 58.

On July 16, 2015, Defendant Sampong examined Plaintiff. *Id.* at 62. He reported the wound was improving and recommended warm compresses. *Id.*

On Friday, July 17, 2015, Defendant Lori Slavick examined Plaintiff. *Id.* at 64-65. She noted that Plaintiff had pain and swelling in his right calf. *Id.* at 64. Later that day, Plaintiff expressed concern to Nurse Ausherman that the intravenous site should be changed and initially refused his antibiotic medication. *Id.* at 66. Ausherman explained that she could not start a new intravenous site without a medical order. *Id.* Plaintiff changed his mind and the antibiotic was administered. *Id.* Plaintiff rated his pain as 10 out of 10 and said he ambulated with crutches. *Id.* As noted, Dr. DeRosa's July 15, 2015 note had anticipated that Plaintiff would be seen by Dr. Krishnaswammy that day, a Friday. *Id.* at 57. The record does not reflect whether Plaintiff was seen that day by Dr. Krishnaswammy.

On July 18, 2015, Dr. Tessema examined Plaintiff. *Id.* at 67-68. Tessema noted Plaintiff's continuing pain and swelling, and a yellow and white discharge from the wound site. *Id.* at 67. Nurse Cynthia Martin saw Plaintiff for skilled nursing care. *Id.* at 69. Plaintiff was administered a Vancomycin test to monitor levels of the antimicrobial drug in the blood. *Id.*; ECF No. 9-3 at 11 n.23. Martin recorded that Tessema was aware of the results and indicated the Vancomycin would be adjusted. ECF No. 9-4 at 69.

On July 19, 2015, Matthew Carpenter, P.A., examined Plaintiff. *Id.* at 70-71. Carpenter reported that Plaintiff was awaiting a PICC [3] line. *Id.* Carpenter observed the wound was an irregularly-shaped, 5.4 cm ulceration with red, yellow, and pink hard exudate scattered throughout. *Id.* The wound was surrounded by a mild thrombocytopenic purpura (TPP). ECF No. 9-3 at 11 n.24. TPP is a rare blood disorder in which blood clots form in small blood vessels throughout the body, and can limit the flow of blood to the body's organs. *Id.* Nurse Martin changed Plaintiff's dressing that evening, and noted a purulent yellowish brown drainage. ECF No. 9-4 at 72. Plaintiff rated his pain as 7 out of 10. *Id.* The results of Plaintiff's wound culture were listed as still pending. *Id.* at 70-72.

On July 20, 2015, Nurse Martin reported that Plaintiff had no fever, changed his dressing, and continued his antibiotics. *Id.* at 73. Martin noted a telemedicine conference was scheduled for 1:00 p.m. (1300 hrs.) to discuss Plaintiff's wound evaluation and treatment. *Id.* That evening, Dr. DeRosa examined Plaintiff during infirmary rounds, and observed that Plaintiff had started Cipro, an antibiotic, on the previous day. *Id.* at 74. Dr. DeRosa saw increased wound drainage and some improvement in the gastrocnemius muscle, a muscle in the calf, possibly due to the Cipro. *Id.* The culture report indicated E coli and pseudomonas, both of which are sensitive to

---

[3] A PICC line is a percutaneously inserted central catheter. A PICC is used when the patient needs intravenous (IV) medical treatment over a long period of time or if blood draws done using the more common method have become difficult. *See* https://medlineplus.gov/ency/patientinstructions/000461.htm.

Cipro. *Id.* Dr. DeRosa reported that Dr. Atnfu "did telemed at 1 pm and picuture [sic] taken of wound so he could communicate with DR (sic) Krishnaswammy. Apparently pt is to go to BSH [Bon Secours Hospital] for surgical debridement since tendon infection can be bad due to poor blood supple [sic]." *Id.* DeRosa indicated that there may be difficulty transporting Plaintiff at that time, but the scheduler would try to arrange for custody staff to transfer Plaintiff to the BSH early in the morning. *Id.*; ECF No. 9-3 at 12 nn.25 & 26.

On July 21, 2015, Plaintiff was transported to Bon Secours Hospital for surgical debridement of the wound. ECF No. 9-5 ¶ 12. Dr. Druckman attests the procedure was indicated due to risks inherent in a tendon infection due to low blood supply to the tendons. *Id.* Plaintiff returned to the MCIH infirmary the same day. ECF No. 9-4 at 75-77. Kathleen McCauley, RN provided skilled nursing care to Plaintiff upon his return. *Id.* McCauley indicated the anticipated PICC line was not inserted but that Plaintiff's wound was debrided and the sutures were removed. *Id.* The dressing on Plaintiff's right ankle was dry and intact. *Id.*

On July 22, 2015, Dr. DeRosa examined Plaintiff in the infirmary. *Id.* at 78-79. DeRosa noted that the center tissue of Plaintiff's wound was removed, and that there was no redness or warmth around the lesion. *Id.* at 78. He observed that the wound was draining a lot of serosanguinous, but no pus. *Id.*

On July 23, 2015, Nurse Cynthia Martin dressed the wound, noting a moderate amount of serosanguinous drainage, a decrease in redness and swelling, and no odor. *Id.* at 80. Plaintiff rated his pain level at 8 out of 10. *Id.* Defendant Sampong examined Plaintiff during infirmary rounds. *Id.* at 81-82. Sampong noted the wound was unchanged and indicated that Plaintiff would begin topical oxygen therapy ("TOT") that day. *Id.* at 81. Haydee Rawley, R.N. later changed Plaintiff's dressing and applied TOT. *Id.* at 83. Rawley reported Plaintiff tolerated TOT

well. *Id.*

On July 24, 2015, Nurse Ausherman observed serosanguinous drainage on Plaintiff's dressing with some bloody drainage on the foot outside the dressing. *Id.* at 84. There was no odor. *Id.* Plaintiff's ankle was edematous and erythematous above the dressing. *Id.* She applied TOT. *Id.* Ausherman described the site as a beefy red wound that included a thick yellow mucous plug. *Id.*

On July 25, 2015, Dr. Tessema observed the wound site was healing and there was less swelling. *Id.* at 86.

On July 27, 2015, Dr. DeRosa noted that Plaintiff's calf had improved but was still painful. *Id.* at 88. The wound was healing and filling in, but Plaintiff was concerned because oxygen therapy was not provided over the weekend. *Id.* DeRosa explained that the therapy had been ordered only for weekdays, and they were out of oxygen that day. *Id.* Moving Plaintiff back to the general prison population for wound care was delayed until the wound was checked and possibly after the follow-up visit with Dr. Krishmaswammy. *Id.* at 88-89.

On July 28, 2015, Dr. DeRosa examined Plaintiff who reported Ultram did not relieve his pain and requested Tylenol #3. *Id.* at 90. Plaintiff reported decreased hardness in the lower calf and decreased pain. *Id.* DeRosa observed Plaintiff's wound was improving and there were no signs of infection. *Id.*

On July 29, 2015, Dr. DeRosa indicated drainage was observed when Plaintiff's dressings were changed. *Id.* at 92. He continued Plaintiff's Lovenox (an anticoagulant) prescription and oxygen therapy. *Id.*; ECF No. 9-3 at 4 n.9. Plaintiff's dressings were changed twice a day. ECF No. 9-4 at 92.

On July 31, 2015, Dr. Thompson saw Plaintiff during infirmary rounds. *Id.* at 93-94. He

noted that Plaintiff continued to receive oxygen therapy and that he did not complain of pain. *Id.* at 93.

On August 1, 2015, Dr. Tessema observed the wound was healing and the infection was resolving. *Id.* at 95. Plaintiff presented complaints of pain and his leg was swollen near the wound. *Id.* Tessema changed the antibiotic to Augmentin. *Id.* at 95-96.

On August 2, 2015, Janine Griffith, P.A. saw Plaintiff during infirmary rounds. *Id.* at 97-98. Plaintiff complained about the tightness of his Achilles tendon. *Id.* at 97. Plaintiff was performing simple stretching of his ankle. *Id.* His pain at the time was well controlled on the current medication regimen. *Id.* Griffith observed the wound as pink/red with beefy granulation and pink wound edges. *Id.* There was a small central area of dead tissue (eschar) of approximately 1cm x 1.5.diameter and a small amount of discharge from the wound. *Id.* Sensation was intact to sharp and dull touch and no pus or bleeding was observed. *Id.* at 97-98.

On August 3, 2015, Defendant Slavick examined Plaintiff, noting that his oxygen therapy was continuing. *Id.* at 99-100. Plaintiff expressed no new complaints. *Id.* at 99. Defendant Slavick noted his pain was moderate and his status was stable. *Id.*

On August 4, 2015, Plaintiff's laboratory culture results showed the presence of pseudomonas and Klebsiella strains of bacterial infection. ECF No. 9-5 ¶ 10. Dr. Druckman attests that during collegial discussion in utilization management it was presumed the infection was possibly due to fecal contamination. *Id.* E Coli, pseudomonas, and Klebseilla bacteria are common bacteria in the body in low amounts and may be found in diverse environments. *Id.* Patients with open wounds, illness, or reduced resistance are at greater risk of infection by these bacteria although otherwise healthy individuals can also become infected. *Id.* Because certain strains of pseudomonas and klebsiella are becoming antibiotic resistant, careful monitoring of

treatment results is important to determine whether alternate antibiotic medications should be selected. *Id.* Druckman explains that during the course of his infirmary admission, Plaintiff's antibiotics were adjusted to optimize results. *Id.* at ¶ 11; ECF No. 9-4 at 102.

Dr. DeRosa discharged Plaintiff from the MCIH infirmary on August 5, 2015. ECF No. 9-4 at 103. DeRosa summarized Plaintiff's wound history, including the assessment that after surgery and a brief initial stay in the infirmary, Plaintiff was discharged on June 16, 2015 to the general population with instructions for daily wound care, which Plaintiff may have missed. *Id.* DeRosa further asserted that Plaintiff had developed a superficial incision dehiscence and presumably contamination led to an abscess under the Achilles tendon repair. *Id.* DeRosa also noted that the wound was healing and oxygen therapy had been applied. *Id.* DeRosa ordered this treatment to continue until Plaintiff was seen by Dr. Krishnaswammy. *Id.* at 103-05. DeRosa continued Plaintiff's daily wound care and Lovenox until he saw Dr. Krishnaswammy and was able to walk with full weight-bearing. *Id.* DeRosa ordered that an appointment with Dr. Krishnaswammy be scheduled for Plaintiff. *Id.*

On August 18, 2015, Defendant Slavik saw Plaintiff, who complained of pain in his right leg. *Id.* at 106. Plaintiff asked to be taken off feed-in status, against medical advice. *Id.* Slavik assessed his condition as stable. *Id.*.

On August 24, 2015, Plaintiff returned from Bon Secours Hospital after his follow-up visit with Dr. Krishnaswammy. *Id.* at 115. Erica Alexis, LPN wrote on Plaintiff's medical chart that his wound was cleaned with sterile solution and a non-adherent dressing was applied, there was serous drainage without a bad odor, and there was no swelling. *Id.* Plaintiff did not have a fever and he returned to his housing unit using crutches. *Id.*

On August 28, 2015, Defendant Slavick saw Plaintiff to follow-up with Dr.

Krishnaswammy's recommendations, including daily dressing changes, use of an ankle brace and crutches, and a continuing regimen of antibiotic and pain medication. *Id.* at 119-20. Krishnaswammy also recommended gentle range of motion (ROM) exercises, but no physical therapy until the wound healed. *Id.*

On August 31, 2015, DeRosa saw Plaintiff. DeRosa observed the wound was essentially closed and discontinued further oxygen therapy. *Id.* at 122.

On September 14, 2015, Erica Alexis, LPN cleaned Plaintiff's wound and applied a new dressing. *Id.* at 123. She noted mild swelling around the wound area and Plaintiff complained of soreness. *Id.* She referred him to a medical provider for evaluation. *Id.* When Alexis saw Plaintiff on September 15, 2015, she noted that Plaintiff walked into the medical room with a slight limp and without his crutches. *Id.* at 124.

On September 17, 2015, Defendant Sampong evaluated Plaintiff's wound. *Id.* at 125. Sampong's assessment was that the wound was healing well. *Id.* Plaintiff reported a mild discharge from the affected area. *Id.*

On September 23, 2015, a telemedical conference was conducted during which Dr. Krishnaswammy recommended continuing daily dressings, use of crutches and an ankle brace, pain and antibiotic medication, and a follow-up appointment in three weeks. Krishnaswammy said Plaintiff could perform gentle ROM exercises, but did not recommend physical therapy. *Id.* at 126.

On October 4, 2015, Plaintiff was seen at the dispensary for wound care. *Id.* at 131. It was noted that he had missed his last 3 appointments. *Id.* Plaintiff was reminded of the importance of complying with recommended wound care. *Id.* At this time, he complained his wound was painful. *Id.* The wound was then cleaned and the dressing was changed. *Id.*

On October 6, 2015, Plaintiff's wound care follow-up was again discussed at a telemedicine conference, attended by Drs. Getachew and Krishnaswammy. *Id.* at 132-34. The wound was healing but still painful. *Id.* at 132. The doctors recommended continuing daily wound dressing, beginning physical therapy, and following up in 5-6 weeks. *Id.* at 132-33, 135.

On November 2, 2015, Sampong examined Plaintiff for complaints of ankle soreness. *Id.* at 137-38. Sampong indicated the wound had improved. Plaintiff reported a mild discharge from the affected area, but denied other symptoms. *Id.* at 137. Sampong referred Plaintiff to a provider for wound care. *Id.* at 138.

On December 5, 2015, Dr. Tessema examined Plaintiff. Tessema observed the cellulitis had resolved, but noted Plaintiff had an open wound on his posterior right ankle. *Id.* at 143. There was no discharge or swelling and he had no fever. *Id.*

On December 8, 2015, Plaintiff returned his crutches to the medical office. *Id.* at 145. He walked out without expressing any complaints. *Id.*

On December 18, 2015, Sampong saw Plaintiff for wound care. *Id.* at 146-47. Plaintiff reported that the wound was healing. *Id.* at 146. Sampong ordered daily dressing changes until healing was complete. *Id.*

On January 21, 2016, Dr. Tessema examined Plaintiff. *Id.* at 147-48. Tessema noted a small healing wound on Mickey's right ankle and prescribed triple antibiotic ointment. *Id.* at 147.

On February 18, 2016, Sampong examined Plaintiff and noted the wound was healing well. *Id.* at 149. Sampong observed no signs of infection and directed Plaintiff to change his dressings daily. *Id.*

In his affidavit, Dr. Duckman attests:

> In my opinion to a reasonable degree of medical probability,
> Plaintiff received appropriate treatment for his right Achilles
> tendon repair wound and subsequent infection while Plaintiff was
> at MCIH. Plaintiff does not state specifically what medical
> instructions were allegedly disregarded by PA Sampong and PA
> Slavick, but there are often alternative options that may
> appropriately address a certain specific condition. In my opinion,
> to a reasonable degree of medical probability, the medical care
> Plaintiff received from his medical providers at MCIH, including
> the care rendered by PA Sampong and PA Slavick, was
> appropriate for Plaintiff's condition. Plaintiff's surgical site
> infection was treated and it resolved. Plaintiff was returned to the
> general prison population in stable condition for continued healing
> at the surgical site. Plaintiff has continued to receive ongoing care
> for his needs through the sick call process.

ECF No. 9-5 ¶ 15.

## II.     STANDARD OF REVIEW

To survive a motion to dismiss invoking 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555) ("a plaintiff's

obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

conclusions, and a formulaic recitation of a cause of action's elements will not do.").

Fed. R. Civ. P. 12(b)(6)'s purpose "is to test the sufficiency of a complaint and not to

resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

*Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal

quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must

accept as true all of the factual allegations contained in the complaint," and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979). Because Plaintiff is self-represented, his filings are liberally construed. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007). But the Court must also abide by its "affirmative obligation ... to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal citations omitted). The claims against Wexford Health Resources, Inc. will be considered in the context of a Motion to Dismiss.

Defendant's motion is styled as a Motion to Dismiss, or in the Alternative, for Summary Judgment under Fed. R. Civ. P. 56. If the Court considers materials outside the pleadings, as the Court does here regarding the claims against Defendants Slavick and Sampong, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* When the moving party styles its motion as a "Motion to Dismiss, or in the Alternative, for Summary Judgment," and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.,* 149 F.3d 253, 260-61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for

summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre-or post-discovery).

However, summary judgment should not be granted if the nonmoving party has not had the opportunity to discover information that is essential to his opposition to the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1987). If the nonmoving party feels that the motion is premature, that party can invoke Fed. R. Civ. Pro. 56(d). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Under Rule 56(d), the Court may deny a motion for summary judgment if the non-movant shows through an affidavit that, for specified reasons, he or she cannot properly present facts, currently unavailable to him or her, that are essential to justify an opposition. Fed. R. Civ. Pro. 56(d). "'[T]he failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (citations omitted). But a failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court served as the functional equivalent of an affidavit." *Id.* at 244-45 (citations and internal quotation marks omitted).

Defendants filed 149 pages of Plaintiff's medical records and the declaration of Dolph Druckman, M.D., Acting Regional Medical Director at MCIH, in support of their dispositive motion. ECF No. 9-4; ECF No. 9-5. Plaintiff has not filed an affidavit under Rule 56(d) or made an equivalent showing of the need for more discovery. Further, Plaintiff was provided with a *Roseboro* notice, which advised him of the pendency of the motion and that he was entitled to respond, ECF No. 10; *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975) (holding pro se

plaintiffs should be advised of their right to file responsive material to a motion for summary judgment), and in fact did file a Response. Thus, the Court will convert Defendant's Motion to Dismiss into a Motion for Summary Judgment with respect to Plaintiff's claims against Slavick and Sampong.

## III.   DISCUSSION

Defendants seek dismissal on the grounds that the Complaint fails to state a claim against Wexford because there is no vicarious liability (respondeat superior) under 42 U.S.C. § 1983 and summary judgment because Plaintiff has failed to demonstrate that Defendants Slavick and Sampong violated the Eighth Amendment through "deliberate indifference" to a "serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

### A.   Supervisory Liability

The doctrine of respondeat superior does not apply to § 1983 claims. *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 691 (1978); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To state a claim for supervisory liability under § 1983, Plaintiff must allege that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an

affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Baynard*, 268 F.3d at 325; *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). A private corporation may be held liable under § 1983 "only when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (1999); *see also Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (4th Cir. 1990) (noting policy or custom liability established by *Monell* applied to private businesses). The complaint does not attribute the alleged constitutional violations to an official policy or custom of the corporate defendant. Consequently, the claims against Wexford will be dismissed.

### B. Post-Surgical Wound Treatment

Defendants Sampong and Slavick assert they are entitled to summary judgment because Plaintiff fails to demonstrate an abridgment of his right to constitutionally adequate medical treatment.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. CONST. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. at 104; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A deliberate indifference claim consists of both an objective and a subjective component. *Jackson*, 775 F.3d at 178. Objectively, the inmate's condition must be "serious," or "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). Subjectively, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or

19

safety.'" *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). If a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk[.]" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995); s*ee also Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

Additionally, the medical treatment provided must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)), *overruled in part on other grounds by Farmer*, 511 U.S. 825 (1994). A health provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) ("[G]eneral knowledge of the facts creating a substantial risk of harm is not enough . . . . The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate.") (citing *Farmer*, 511 U.S. at 837). Mere negligence or malpractice does not rise to a constitutional level. *Miltier*, 896 F.2d at 851 (citing *Estelle*, 429 U.S. at 106). An inmate's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim." ) (internal citation omitted).

The record provides uncontroverted evidence that Defendants and other medical professionals provided attentive post-surgical wound care to Plaintiff after his Achilles tendon repair surgery. After the surgery, Plaintiff was provided care in the MCIH infirmary. During this time, his vital signs were monitored, his wound was dressed and he was administered medication, including a prophylactic antibiotic. Plaintiff was discharged and returned to the

general prison population several days later after it was determined he had no signs of infection, with instructions to continue his pain medication, daily wound cleaning, and to stay off the leg. Plaintiff was provided crutches and placed on feed-in status. When signs of infection presented, Plaintiff was admitted to the infirmary for treatment. He was treated with antibiotics and pain medication, and regularly examined to monitor his condition. Medical providers ordered lab tests and cultures to determine the nature of the infection and to identify appropriate antibiotic treatment. Plaintiff was transported to Bon Secours Hospital to debride the wound, provided oxygen treatments, and his antibiotics were monitored to assess whether they were effective against the bacteria shown in his test results. Because certain strains of the bacteria shown are becoming resistant to antibiotics, Plaintiff's physicians adjusted and monitored the antibiotic medications administered to him. Plaintiff continued to receive care for his wound and infection in the MCIH infirmary until August 5, 2015 and received follow-up care through February 18, 2016. In his Response, Plaintiff argues that as a result of improper delay of his surgery and inadequate pain medication, his right foot is permanently impaired. ECF No. 13 at 2. These allegations are unsupported by testamentary evidence and belied by the record before this court.

Even when the evidence is viewed in the light most favorable to Plaintiff and all inferences drawn in his favor, there is no genuine issue of material fact regarding whether the Defendants acted with deliberate indifference to his post-surgical wound care amounting to a violation of the Eighth Amendment.[4] Accordingly, Defendants are entitled to summary judgment as a matter of law.

**IV.     CONCLUSION**

For these reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is granted. The claims against Wexford Health Sources, Inc. are dismissed.

---

[4] The Court declines to exercise supplemental jurisdiction over Mickey's malpractice claim.

Summary Judgment is granted in favor of Defendants Slavick and Sampong. A separate Order follows.

Dated: March 22, 2017

GEORGE J. HAZEL
United States District Judge